ORDERED.

**Dated: April 05, 2019**

_____
Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                              Case No. 8:14-bk-01703-MGW
                                                    Chapter 13
Iris Pereira,

    Debtor.
_____/

## MEMORANDUM OPINION AND
## ORDER ON MOTION FOR STAY RELIEF

This case presents somewhat of a Gordian knot. During this case, the Debtor received a $25,429.37 settlement from her homeowner's insurer to cover the cost of repairing fire damage to her home. But an hour after she cashed the check, which

was paid out of her state court lawyer's trust account, the Debtor's state court lawyer learned the insurer had stopped payment on the settlement check because it should have been made payable to the Debtor and the mortgagees on her home. The insurer has issued a replacement check. Now the Debtor's state court lawyer and the mortgagees are fighting over who is entitled to the replacement check.

Ideally, the Court would order the Debtor to return the money to her state court lawyer, and the lawyer would turn the replacement check over to the mortgagees. But the Debtor claims she can't return the money because she spent it on repairs. So if the Court awards the replacement check to the mortgagees, they could receive a windfall if, in fact, the Debtor made the repairs. And that windfall would come at the state court lawyer's expense since he would still be short $25,429.37 in his trust account. The only way to cut this Gordian knot is to allow the Debtor's lawyer to deposit the replacement check and require the Debtor to prove she used the insurance proceeds to repair her home to its pre-fire condition, failing which the mortgagees would be entitled to stay relief.

## Background

Eighteen months after filing for chapter 13 bankruptcy, the Debtor had a fire at her house, causing damage to the walls, flooring, ceiling, furnishings, and other personal property[1]. Initially, the Debtor's insurer, Universal Property and Casualty

---

[1] Doc. No. 49, ¶ 4.

Insurance Company—rejected her claim under her homeowner's insurance policy.[2] So the Debtor sued.[3] After a year of litigation, Universal agreed to settle the Debtor's insurance claim by paying her $40,000.[4] This is where the problems began.

For starters, the Debtor never told her state court counsel that she was in bankruptcy.[5] Because the lawyer handling the Debtor's state court litigation, John Adams, didn't know the Debtor was in bankruptcy, his employment as the Debtor's state court counsel was never approved by the Court. More important, Adams (understandably) never sought approval of the compromise. As it turns out, those were only minor issues, which were easily resolved later on.

The bigger problems came when Universal paid the settlement amount. Universal paid the $40,000 with two checks.[6] The first check, for $12,333.33, was for Adams' contingency fees.[7] The second check, for $26,666.67, was for the Debtor to complete the cosmetic and structural repairs.[8] The second check was made payable only to the Debtor. Adams deposited both checks into his firm trust account.[9]

---

[2] *Id.* at ¶ 5.

[3] *Id.*

[4] *Id.* at ¶¶ 6 & 7.

[5] *Id.* at ¶ 12.

[6] *Id.* at ¶ 7, Ex. B.

[7] *Id.*

[8] *Id.*

[9] *Id.* at ¶ 8.

Adams then issued a $25,429.37 check to the Debtor for her share of the settlement proceeds.[10] That same day the Debtor cashed the $25,429.37 check.[11] An hour later, SunTrust Bank, where Adams maintained his law firm trust account, informed Adams that Universal had stopped payment on the $26,666.67 check because the Debtor was in bankruptcy and, as a consequence, the settlement check should have been made payable to the Debtor, as well as Santiago and Isabel Casal, who held a mortgage on the Debtor's property.[12]

It was at that point that Adams learned for the first time that the Debtor was in bankruptcy.[13] Had he known the Debtor was in bankruptcy, he would have never issued the settlement check to the Debtor without Court approval.[14] Universal promptly issued a replacement check made payable to the Debtor and the Casals, which Adams is now holding but has not deposited.[15] So Adams was still out the $25,429.37 he paid the Debtor from his firm trust account.

---

[10] *Id.* at ¶ 9. The $24,429.37 payment was the $26,666.67 insurance proceeds for the cosmetic and structural repairs less some expenses. *Id.*

[11] *Id.* at ¶ 10.

[12] *Id.* at ¶¶ 10 – 11.

[13] *Id.* at ¶ 12.

[14] *Id.*

[15] *Id.* at ¶ 14.

At first glance, this problem seemed easily fixable. Adams sought approval of the underlying compromise.[16] As part of that motion, Adams sought permission to negotiate the replacement check and deposit it into his trust account to reimburse his firm for the money it paid out to the Debtor.[17] If granted, the Debtor's motion would have resolved the check fiasco.

But the Casals (the mortgage holders) objected to the compromise motion because they claimed they had the right to the replacement check.[18] Under the parties' mortgage, the Casals have the right, in the event of a casualty loss, to elect to apply the insurance proceeds to repair the insured premises or reduce the underlying mortgage debt.[19] At that point, the Debtor's bankruptcy counsel (David Thorpe) represented to the Court that the Debtor was still holding $20,000 from the original check, which would (more or less) give the Casals that option.

At a hearing on the Debtor's motion to compromise, the Court approved the underlying settlement.[20] As for who was entitled to the replacement check, the Court indicated it may ultimately require a trial on this issue. To preserve the status quo

---

[16] *Id.* at ¶¶ 18 – 24.

[17] *Id.* at ¶¶ 26 & 27.

[18] Doc. No. 55.

[19] *Id.* at Exhibit A (providing that "in the event of loss or damage to the buildings or improvements on said premises, the proceeds of such insurance shall be applied in reduction of the debt, or in restoring the premises or property, as the mortgagee shall elect").

[20] Doc. No. 64.

until any trial, the Court ordered the Debtor to turn over the $20,000 to her bankruptcy counsel to hold in his trust account.[21]

So long as the $20,000 was preserved, the problem was still fixable. But that was not the case. Rather than turn over the $20,000, the Debtor changed her story, claiming she spent all the insurance proceeds repairing her house. So where does that leave us?

Adams is out the $25,429.37 his firm paid the Debtor from the firm trust account. The Debtor got the $25,429.37. But there's no proof she used the money to repair the premises. Because there's no proof the Debtor used the insurance proceeds to repair the premises, there is no way of knowing whether the Casals' collateral is being adequately protected.

Adams has asked the Court to hold the Debtor in contempt for not turning over the $20,000.[22] Adams has also asked the Court to hold the Debtor's bankruptcy counsel (David Thorpe) in contempt.[23] The Casals have asked the Court to require Adams to turn over the replacement check to them.[24] In the alternative, the Casals have also sought stay relief so they can go to state court and sue to foreclose their

---

[21] *Id.* at ¶ 3.

[22] Doc. No. 67.

[23] Doc. No. 101.

[24] Doc. No. 99.

mortgage based on the Debtor's breach—i.e., the Debtor's failure to turn over the insurance proceeds.[25]

## Conclusions of Law

Under the circumstances of this case, the Court concludes it is not appropriate to require Adams to turn over the replacement check to the Casals. It is technically true that the Casals have the right to elect whether to apply the insurance proceeds toward reducing their mortgage debt or repairing the insured premises. But it is also true that the Debtor has the right to use the insurance proceeds since the funds are property of the estate.

Bankruptcy Code § 1303 grants to a chapter 13 debtor the same rights that a trustee has under § 363(b).[26] Under § 363(b), the trustee has the right, after notice and a hearing, to use property of the estate other than in the ordinary course of business.[27] But § 363(e) conditions that right on the trustee (or a chapter 13 debtor) providing adequate protection.[28] At least one bankruptcy court has relied on §§ 1303 and 363(b) to authorize a chapter 13 debtor to use insurance proceeds to replace damaged collateral over a secured creditor's objection.[29]

---

[25] Doc. No. 66.

[26] 11 U.S.C. § 1303.

[27] 11 U.S.C. § 363(b).

[28] 11 U.S.C. § 363(e).

[29] *Carey v. Gen. Motors Acceptance Corp. (In re Carey)*, 202 B.R. 796 (Bankr. M.D. Ga. 1996).

In that case, *In re Carey*, the debtor owned a 1995 Chrysler Sebring that was financed through General Motors Acceptance Corporation.[30] A month after filing for chapter 13, the debtor was involved in a car accident, where the Sebring was totaled.[31] The debtor's automobile insurer issued a check payable to General Motors Acceptance, care of the debtor, for the value of the car.[32]

The debtor in *Carey* wanted to use the insurance proceeds to buy a new car.[33] Contending the insurance proceeds were cash collateral, the debtor proposed a replacement lien on the new car as adequate protection.[34] General Motors Acceptance argued that only a debtor engaged in business (which was not the case in *Carey*) had the right to use cash collateral.[35] Looking to § 363(b), the bankruptcy court concluded that the debtor was authorized to use property of the estate, including a secured creditor's collateral, so long as the debtor provided the secured creditor adequate protection.[36]

Here, had the Debtor sought approval to use the insurance proceeds to repair her home, the Court would have followed *Carey*, even over an objection by the

---

[30] *Id.* at 797.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at 797 – 98.

[35] *Id.* at 798.

[36] *Id.* at 799.

8

Casals that they had a right to insist that the insurance proceeds be used to pay down the debt. The Court, however, would have conditioned the use of the insurance proceeds on adequate protection under § 363(e). Ensuring that the Debtor repaired the Casals' collateral to its pre-fire condition would have done exactly that.[37]

And that leads to the real problem here. The problem is not whether the Debtor should be allowed to use the insurance proceeds to make the repairs; it's that we don't know if the Debtor actually used the insurance proceeds to make the repairs. At this point, the Court is not confident the Debtor has, in fact, repaired her home. That leaves the Court two options.

The Court could simply disburse the insurance proceeds to the Casals, as they've requested.[38] But that poses two problems. First, the Casals would get a windfall if the Debtor did, in fact, make the repairs. Second, that windfall would come at the expense of Adams, who would still be out the $25,429.37 he disbursed to the Debtor. That would be inequitable.

The other option would be to grant the Casals stay relief, which they have also requested.[39] According to the Casals, the Debtor has squandered the insurance proceeds, entitling them to stay relief under § 362(d)(1). Section 362(d)(1) provides

---

[37] In fact, it appears there is substantial equity in the home. Doc. No. 102, ¶ 12. And under her plan, the Debtor is curing her mortgage arrearages and making adequate protection payments to the Casals.

[38] Doc. No. 99.

[39] Doc. No. 66.

that the Court shall grant stay relief for cause, including if the Casals are not being adequately protected.[40] If the Debtor did not make the repairs, then the Casals would not be adequately protected and would therefore be entitled to stay relief. This second option avoids the possibility that (1) the Casals will receive a windfall; and (2) Adams will be left holding the bag.

## Conclusion

The Court elects the second option. The Court will allow Adams to deposit the replacement check. The Court will also implement a streamlined process for the Debtor to show that she used the insurance proceeds to make the required cosmetic and structural repairs necessary to restore her home to its pre-fire condition. If she did not, then the Casals are entitled to stay relief. Accordingly, it is

**ORDERED**:

1.     The Casals' motion to disburse the insurance proceeds[41] is DENIED. John Adams is authorized to deposit the $26,666.67 replacement check from Universal into his firm trust account. The Debtor and the Casals shall take all steps necessary for Adams to deposit the check into his firm trust account, including negotiating the check.

---

[40] 11 U.S.C. § 362(d)(1).

[41] Doc. No. 99.

2. The Casals' stay relief motion[42] is GRANTED to the extent set forth in this Order. Within 14 days of this Order, the Debtor shall file a detailed accounting of her use of the insurance proceeds. The accounting shall include any receipts or other records establishing that the insurance proceeds were used to repair the fire damage.

3. As soon as the accounting is filed, the Court will promptly set a hearing for the Debtor to put on a prima facie case that the repairs she made restored her home to the condition it was in before the fire. At this hearing, the Casals are not expected to put on any evidence. The purpose of the hearing is to establish that the Debtor, in fact, made the repairs and that the repairs restored the Debtor's home to its pre-fire condition.

4. If the Debtor makes the required showing, the Court will schedule a final evidentiary hearing at which the Casals can challenge the repairs the Debtor made and contest whether they are adequately protected in light of those repairs.

5. If the Debtor fails to timely file the accounting or make a prima facie showing that she made the repairs, the Court will grant immediate stay relief to the Casals.

---

[42] Doc. No. 66.

      6.      The Court denies' Adams motion to hold the Debtor's bankruptcy counsel (David Thorpe) in contempt.[43] The Court reserves jurisdiction to determine whether the Debtor should be held in contempt.[44]

---

Attorney Allan C. Watkins is directed to serve a copy of this Memorandum Opinion and Order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Memorandum Opinion and Order.

---

**Allan C. Watkins, Esq.**
   **Watkins Law Firm, P.A.**
**John W. Adams, Esq.**
   **Adams Law Association, P.A.**
*Counsel for Adams Law Association P.A.*

**Kenneth R. Case, Esq.**
   **Brown & Associates Law & Title, P.A.**
*Counsel for Santiago and Isabel Casal*

**David Thorpe, Esq.**
   **Thorpe Law Firm, P.A.**
*Counsel for Thorpe Law Firm, P.A.*

---

[43] Doc. No. 101.

[44] Doc. No. 67 & 101.